IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHARLENE R. et al., | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | No. 13-cv-6228 |
| v. | : | |
| | : | |
| SOLOMON CHARTER SCHOOL et al., | : | |
| Defendants. | : | |

MCHUGH, J.                                                                                         NOVEMBER 21, 2014

### MEMORANDUM

The case before this Court raises important questions regarding whether a resolution agreement between a child and a charter school reached pursuant to the Individuals with Disabilities Education Act (IDEA) should be enforceable against the Commonwealth of Pennsylvania's Department of Education, as the State Education Agency, where the charter school has become insolvent and has ceased to exist, leaving the child with nowhere else to turn to vindicate his right to a free appropriate public education. I conclude that such an agreement can be enforced against the Commonwealth in this limited scenario.

**I.      Factual Background**

M.R., a sixteen-year-old in the tenth grade, attended Solomon Charter School in Philadelphia during the 2012-2013 school year. M.R. has a disability that makes him eligible for special education services. The Plaintiffs allege that Solomon did not perform an adequate comprehensive multi-disciplinary evaluation of his special educational needs, failed to provide an adequate individualized education plan, failed to provide an education that allowed him to make meaningful progress, and retaliated against his parent, Charlene R., when she pursued an IDEA claim. Charlene R. retained the Law Offices of David J. Berney, and the representation

1

agreement contains an assignment of rights provision in which Charlene R. assigned to the firm any right that she may independently have to attorneys' fees owed to her.

Charlene R. then filed a due process complaint, and the Plaintiffs settled the case with Solomon pursuant to 20 U.S.C. § 1415(f)(1)(B). The resolution agreement called for: (1) Solomon to establish an educational trust fund for the sole benefit of M.R. in the amount of $18,502; (2) Solomon to provide 190 hours of compensatory education valued at $30 an hour; (3) $9,250 from the trust to be payable to the Law Offices of David J. Berney for attorneys' fees and costs related to the matter; (4) in the event Solomon voluntarily ceases operations, it shall inform the Law Offices of David J. Berney in writing no more than 7 days after and shall accelerate payment of the remainder of funds into the educational trust fund within the same period; (5) Solomon to be responsible for any additional attorneys' fees incurred by Charlene R. in enforcing the agreement.

The resolution agreement was signed by Solomon on September 26, 2013. Solomon then ceased operations on October 11, 2013—just over two weeks later. Solomon had not made any payments into the trust fund or toward attorneys' fees, and did not send written notice as required by the agreement. The Plaintiffs initially filed suit against Solomon, but have now amended their complaint to include the Commonwealth Defendants as well. At argument, counsel for Plaintiffs represented that multiple attempts to collect from Solomon have been fruitless, and that for all practical purposes it is defunct. The Plaintiffs have structured Count I as an IDEA claim and Counts II and III as breach of contract claims. The Commonwealth Defendants have moved to dismiss all counts against them.

## II.     IDEA Framework

The Individuals with Disabilities Education Act (IDEA) as it exists today is the former Education for All Handicapped Children Act (EHA), which was renamed in 1990. The Act seeks to ensure that every child with a disability has access to a "free appropriate public education" (FAPE) that is tailored to meet his or her unique educational needs. See 20 U.S.C. § 1400. In fact, the Third Circuit has stated that "[t]he IDEA requires that states to receive federal education funding make available a free and appropriate public education to all children with disabilities residing within their borders." D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 556 (3d Cir. 2010). A "free appropriate public education" is defined within the act as special education and related services that: (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State Educational Agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d). 20 U.S.C. § 1401(9).

In order to receive federal money under the IDEA, a state must submit a plan of compliance to the Secretary of Education, who then distributes funding. 20 U.S.C. §§ 1412-1414. The Act then gives the State Education Agency (SEA) the responsibility of apportioning the funds to Local Education Agencies (LEAs), whereby the LEAs apply to the SEA in order to receive that funding. 20 U.S.C. § 1413(a). The SEA is responsible for ensuring that LEAs comply with the mandates of the IDEA in providing educational services to those eligible students. 20 U.S.C. § 1412(a)(11)(A).

The LEA, as the entity that is actually providing services to children with disabilities, must develop an Individualized Education Program (IEP) for each eligible child that should

3

include (1) present levels of achievement and performance, (2) measurable annual goals, and (3) special education and supplementary aids and services to be provided to the child, as well as other details regarding the child's educational program.  20 U.S.C. § 1414(d)(1)(A)(i).  The IEP should evolve with the child's development, and should be continually revised as appropriate. 20 U.S.C. § 1414(d)(4).

> Thus, IDEA delegates supervisory authority to the SEA, which is responsible for administering funds, setting up policies and procedures to ensure local compliance with IDEA, and filling in for the LEA by providing services directly to students in need where the LEA is either unable or unwilling to establish and maintain programs in compliance with IDEA. The LEA, on the other hand, is responsible for the direct provision of services under IDEA, including the development of an individualized education program (IEP) for each disabled student, the expenditure of IDEA funds to establish programs in compliance with IDEA, and the maintenance of records and the supply of information to the SEA as needed to enable the SEA to function effectively in its supervisory role under IDEA.

Gadsby v. Grasmick, 109 F.3d 940, 943 (4th Cir. 1997).

The IDEA also provides a set of procedural safeguards to ensure that parents may contest decisions regarding their children.  Most importantly, parents have the right to an impartial due process hearing conducted by either the SEA or the LEA.  20 U.S.C. § 1415(f).  Aggrieved parents may then bring a civil action in a state court of competent jurisdiction or in a United States District Court.  20 U.S.C. § 1415(i)(2).

Sovereign immunity does not bar suits against the states under the IDEA.  The Act itself contains a provision abrogating state sovereign immunity.  See 20 U.S.C. § 1403.  The Third Circuit has further upheld that the acceptance of funds under the IDEA results in a waiver of sovereign immunity pertaining to IDEA claims.  A.W. v. Jersey City Public Schools, 341 F.3d 234, 254 (3d Cir. 2003).

**III.     The IDEA Claim**

*A.  SEA Liability for Provision of FAPE under the IDEA*

This Court's analysis of the IDEA claim must be guided primarily by the Act itself and the intent of Congress as discerned by the Third Circuit Court of Appeals.  I begin with the language of 20 U.S.C. § 1412(a)(11)(A), which provides:

> The State educational agency is responsible for ensuring that—
> (i)      the requirements of this subchapter are met;
> (ii)     all educational programs for children with disabilities in the State, including all such programs administered by any other State agency or local agency—
> (I)      are under the general supervision of individuals in the State who are responsible for educational programs for children with disabilities; and
> (II)     meet the educational standards of the State educational agency

The Third Circuit has analyzed the intent of Congress in enacting this provision, concluding that it reflects the "state's primary responsibility to provide a publicly-supported education for all children and a specific intent to centralize this responsibility."[1]  Kruelle v. New Castle Cnty. Sch. Dist., 642 F.2d 687, 696 (3d Cir. 1981).  Specifically, after examining the legislative history, the Circuit concluded that Congress "considered the establishment of a single agency on which to focus responsibility for assuring the right to education of all handicapped children to be of paramount importance."  Id.  Kruelle cited the following as support for this interpretation:

> Without this requirement, there is an abdication of responsibility for the education of handicapped children. Presently, in many States, responsibility is divided, depending upon the age of the handicapped child, sources of funding, and type of services delivered. While the committee understands that different agencies may, in fact, deliver services, the responsibility must remain in a central agency overseeing the education of handicapped children, so that failure to deliver

---

[1] Kruelle was interpreting the identical provision under the EHA—formerly 20 U.S.C. § 1412(6) at the time Kruelle was decided.

> services or the violation of the rights of handicapped children is squarely the responsibility of one agency.

S. Rep. No. 168, 94th Cong., 1st Sess. 24 reprinted in (1975) U.S.Code Cong. & Ad.News 1425, 1448; Kruelle, 642 F.2d at 696.

Kruelle involved a severely disabled child who had been placed in a full-time residential schooling program in Pennsylvania funded by both the local (LEA) and state (SEA) educational agencies. 642 F.2d at 689. The child and his family then moved to Delaware, but he was enrolled by the LEA in a day-school rather than a residential program. Id. The parents, who felt that the child needed a residential program, withdrew him from the day-school and initiated an administrative action seeking such placement. Id. The action was denied, and the parents sought review in the district court. Id. The district court then determined that the day-school was not able to provide a suitable FAPE, and that the state was responsible for placing the child in a residential program. Id. at 690.

The Third Circuit very clearly stated that the SEA retains primary responsibility to ensure that all children with disabilities receive the education that is their right under the IDEA. Though Kruelle did not directly address whether the state would be responsible for remedying past failures by the local agency, it affirmed the district court's decision that the state would be responsible for "the burden [of] coordinating efforts and financial arrangements for [the child's] education." Kruelle, 642 F.2d at 697.

The Commonwealth is correct that the Supreme Court has not yet definitively addressed this issue, because in the one case where the issue was before the Court, the Justices were equally divided. Specifically, shortly after Kruelle, the Ninth Circuit held that a SEA has a responsibility to step in where a LEA refuses or neglects to provide a FAPE, as follows:

> The state is not obliged to intervene directly in an individual case whenever the local agency falls short of its responsibilities in some small regard. The breach must be significant (as in this case), the child's parents or guardian must give the responsible state officials adequate notice of the local agency's noncompliance, and the state must be afforded a reasonable opportunity to compel local compliance.

Doe by Gonzales v. Maher, 793 F.2d 1470, 1492 (9th Cir. 1986) aff'd as modified sub nom. Honig v. Doe, 484 U.S. 305 (1988). The Supreme Court affirmed the Ninth Circuit's decision to hold the SEA responsible for provision of a FAPE, though it split evenly on the issue, and did not specifically adopt the Ninth Circuits test. Honig, 484 U.S. at 329. Further, the decision addressed the slightly different issue of the responsibility of the SEA to provide direct services to a student, not liability stemming from the failure of a LEA to provide a FAPE.

Other circuits have taken the same view as Kruelle in analyzing SEA liability for private school tuition reimbursement incurred by parents who remove children not receiving a FAPE from a LEA, and subsequently place the child in a private school. See, e.g., Gadsby, 109 F.3d at 943, 952 ("This language suggests that, ultimately, it is the SEA's responsibility to ensure that each child within its jurisdiction is provided a free appropriate public education. Therefore, it seems clear that an SEA may be held responsible if it fails to comply with its duty to assure that IDEA's substantive requirements are implemented."); St. Tammany Parish Sch. Bd. v. State of Louisiana, 142 F.3d 776, 784 (5th Cir. 1998) (quoting Gadsby); Pachl v. Seagren, 453 F.3d 1064, 1070 (8th Cir. 2006) ("The Fourth Circuit has further indicated that state agencies may be financially responsible for the costs of private placement where the applicable local agency was not providing a free and appropriate education.").[2]

---

[2] The Commonwealth cites language from Beard v. Teska, 31 F.3d 942 (10th Cir. 1994), and John T. ex rel. Robert T. v. Iowa Dept. of Educ., 258 F.3d 860 (8th Cir. 2001), in asserting that the IDEA "does not turn every 'local educational agency' under the statute . . . into the agent of the 'State educational agency' as a matter of federal law, so that the latter automatically becomes legally liable for all transgressions of the former." Beard, 31 F.3d at 954. However, both of these cases were analyzing the liability of a SEA for attorneys' fees incurred in a proceeding

In addition to the responsibility placed upon the SEA by Congress in § 1412(a)(11)(A), the IDEA provides that where a LEA is either unable or unwilling to establish and maintain programs for the provision of a FAPE "[a] State educational agency shall use the payments that would otherwise have been available to a local educational agency or to a State agency to provide special education and related services directly to children with disabilities residing in the area served by that local educational agency, or for whom that State agency is responsible . . . ." 20 U.S.C. § 1413(g)(1); Gadsby, 109 F.3d at 953. The Fourth Circuit in Gadsby interpreted this to mean that "the SEA is ultimately responsible for the provision of a free appropriate public education to all of its students and may be liable for the state's failure to assure compliance with the IDEA." 109 F.3d at 953.

Sections 1412(a)(11)(A) and 1413(g)(1), when combined with the congressional intent as discerned by Kruelle, clearly signal that the SEA is to bear primary responsibility for ensuring that every child receives the FAPE that he or she is entitled to under the IDEA. While the SEA ordinarily delegates actual provision of this education to LEAs, the SEA by statute must step in where a LEA cannot or will not provide a child with a FAPE.

B. *Congressional Design to Ensure that Every Child Receives a FAPE as a Right Under the IDEA*

While the burden of ensuring that all eligible children with disabilities receive the FAPE to which they are entitled ultimately falls upon the SEA, this Court must determine whether this obligation extends down the chain of responsibility to resolution agreements reached with the LEA pursuant to 20 U.S.C. § 1415(f)(1)(B). I begin with a review of the progression of

---

against a LEA. The IDEA provides for reasonable attorneys' fees as part of costs to be awarded to the parents of a child who is a prevailing party. See 20 U.S.C. § 1415(i)(3)(B). These cases were determining whether the plaintiffs had been "prevailing parties" against the SEA in these underlying actions, which is not a comparable inquiry to the one at hand—determining whether a SEA should be ultimately responsible for ensuring a child receives the FAPE he is entitled to under the IDEA.

8

recognized remedies available under the IDEA, which sheds light on how such a resolution agreement should be evaluated.

When the Third Circuit decided <u>Kruelle</u>, the question presented was whether the SEA would bear the burden of ensuring that the child received his FAPE moving forward.  That case did not involve a plaintiff who was seeking tuition reimbursement or compensatory education, perhaps because those remedies had not yet been recognized.  <u>Kruelle</u> was decided in 1981, and it was not until 1985 that the Supreme Court recognized tuition reimbursement as a remedy where a LEA had failed to provide a FAPE.  See <u>Burlington School Committee v. Dept. of Educ.</u>, 471 U.S. 359 (1985).

<u>Burlington</u> is notable for the manner in which it characterized the realities of the situation faced by the family.  The case was brought by the parents of a disabled child who had disagreed with the IEP in place, pulled their child from the LEA, and placed him in a private school that would better provide the child with a proper education to meet his special needs.  The parents then sought reimbursement from the LEA for the private school tuition they had incurred while this litigation was pending.  In concluding that such reimbursement was appropriate, the Supreme Court stated:

> [P]arents who disagree with the proposed IEP are faced with a choice: go along with the IEP to the detriment of their child if it turns out to be inappropriate or pay for what they consider to be the appropriate placement. If they choose the latter course, which conscientious parents who have adequate means and who are reasonably confident of their assessment normally would, it would be an empty victory to have a court tell them several years later that they were right but that these expenditures could not in a proper case be reimbursed by the school officials. If that were the case, **the child's right to a free appropriate public education**, the parents' right to participate fully in developing a proper IEP, and all of the procedural safeguards **would be less than complete**. Because **Congress undoubtedly did not intend this result**, we are confident that by empowering the court to grant "appropriate" relief Congress meant to include retroactive reimbursement to parents as an available remedy in a proper case.

Burlington, 471 U.S. at 370 (emphasis added).

Succinctly put, the Court expanded the remedies available under the IDEA to include tuition reimbursement in order to preserve "the child's right to a free appropriate public education," which would otherwise be "less than complete"—a result that "Congress undoubtedly did not intend." See id.  This concept of viewing the provision of FAPE as a right to which children are entitled was endorsed by the Eighth Circuit in Miener v. State of Missouri, 800 F.2d 749 (1986)—the first appellate case to recognize compensatory education as a remedy available under the IDEA.  Compensatory education is a *post hoc* remedy triggered when a child is not being provided with a proper FAPE, but his or her family lacks the means to place the child in another program.  Compensatory education is remedial in nature, designed to allow the child to make up for the education he was entitled to receive but did not.  Miener noted that, "as in Burlington, **recovery is necessary to secure the child's right to a free appropriate public education.**" Id. at 753 (emphasis added).  Moreover, the Eighth Circuit was "confident that Congress did not intend the child's entitlement to a free education to turn upon her parent's ability to 'front' its costs."  Id.  In fact, Miener cogently observed that the case for compensatory education "may present an even more compelling claim for relief than did Burlington, since in Burlington the child had already received educational services without resort to the governmental resources devoted to that purpose . . . ."  Id. at 754.  Miener further noted that the key consideration in Burlington is "not the procedural context of the case, but Congress's goal of providing handicapped children a free appropriate public education." Id. at 754 n.3 (analyzing Smith v. Robinson, 468 U.S. 992 (1984), as well).

The Third Circuit adopted Miener's reasoning and conclusion in Lester H. v. Gilhool, 916 F.2d 865 (3d Cir. 1990), recognizing the remedy of compensatory education.  Gilhool

quoted the language from Burlington that characterizes FAPE as a right to which the child is entitled.  Id. at 872-73.  In restating Miener's endorsement of compensatory education, Gilhool noted that compensatory education "cures the deprivation of a handicapped child's statutory rights, thus providing a remedy which Congress intended to make available."  Id. at 873.  The Third Circuit reinforced this approach in Carlisle Area School v. Scott P., 62 F.3d 520 (3d Cir. 1995), validating its holding in Gilhool and reiterating that "Congress intended compensatory education to be available to remedy the deprivation of the right to a free appropriate education."  Id. at 536.

      These cases make abundantly clear that the Third Circuit, following the lead of the Supreme Court in Burlington, has recognized that the primary goal and driving factor behind the IDEA is Congress's desire that every child receive the FAPE that is their **right** under the Act.  While dealing with compensatory education and tuition reimbursement, these cases also lend valuable insight into how this Court should approach the resolution agreement presented in this case.

    C. *The Merging of SEA Liability and Congressional Intent in Application to Resolution Agreements Pursuant to 20 U.S.C. § 1415(f)(1)(B)*

      M.R.'s parents and the LEA, Solomon Charter School, reached a resolution agreement during the pendency of the administrative process pursuant to 20 U.S.C. § 1415(f)(1)(B).  Section 1415(f)(1)(B)(iii) provides:

> In the case that a resolution is reached to resolve the complaint at a meeting described in clause (i), the parties shall execute a legally binding agreement that is--
>     (I)    signed by both the parent and a representative of the agency who has the authority to bind such agency; and
>     (II)   enforceable in any State court of competent jurisdiction or in a district court of the United States.

11

The Third Circuit, in looking at one such resolution agreement negotiated under § 1415(f), applied contractual principles to conclude that the agreement should be enforced as it was written and agreed to by the parties.  See D.R. v. East Brunswick Bd. of Educ., 109 F.3d 896, 901 (3d Cir. 1997) ("We will therefore enforce the agreement as a binding contract voluntarily entered by both parties.")  Because Congress intended such agreements to be enforceable, it is obvious that the resolution agreement entered into in the case before this Court should be binding and enforceable upon the LEA.  This is undisputed by the parties.

The Commonwealth, however, was not a party to the agreement.  Not surprisingly, relying upon basic principles of contract law, it argues that the family's sole remedy is against Solomon Charter School, which is the only other party to the contract.  By the Commonwealth's reasoning, because it was not a party to the contract or even the negotiations, it cannot be bound by the terms of the agreement.  Beyond that, the Commonwealth argues that it is immune from a common law action to enforce the contract, with the result that the family's sole recourse would be against the defunct charter school.  As a matter of state contract law, the Commonwealth is correct.  That does not end the inquiry, however, as the specific contract in question was created under the IDEA for the purpose of enforcing a child's right to a FAPE.  The issue then becomes whether the Commonwealth's obligations under the IDEA are such that the Commonwealth, as the SEA ultimately responsible for providing M.R. with a FAPE, becomes responsible by operation of the law to meet the obligations of the absent LEA.

There is no question that a district court has jurisdiction to enforce a resolution agreement.  The unsettled question is how a district court should proceed under circumstances where a valid and enforceable agreement was reached between parents and LEA, but the LEA ceases to exist.

When the Court of Appeals held that contractual principles were controlling in D.R. v. East Brunswick Bd. of Educ., it was in the context of holding the parents of a child eligible for services to the terms of the agreement into which they had entered. The court emphasized that the agreement was "voluntarily and willingly entered," and stressed that its holding was "limited to the facts of this case." D.R., 109 F.3d at 901. To underscore the limited nature of its holding, the court included a footnote in its opinion stating: "We emphasize again, however, that in other cases where different facts are at issue, **compelling public policy reasons** may require a different conclusion." Id. at 901 n.2 (emphasis added).

I read the Third Circuit's opinion to mean that contractual principles shall govern the interpretation and enforcement of resolution agreements, so long as those contractual principles do not conflict with the IDEA and its purposes. Stated differently, resolution agreements will generally be honored as written, particularly where they reflect the wishes of parents making educational decisions about their children, but the policy goals of the IDEA must control. In setting forth §1415(f)(1)(B)(iii), Congress plainly intended to ensure that these resolution agreements would be binding and enforceable, and the Third Circuit language stating that the agreements are "a binding contract between the parties and should [be] enforced as written" almost precisely tracks the language of the statute. D.R., 109 F.3d at 898.

The fact that principles of state contract law are brought to bear in construing resolution agreements does not alter the fact that the goal of the IDEA is to ensure that children receive a free appropriate public education, and however complex the procedural path, the ultimate question before the court is whether the child's right has been vindicated. See J.K. v. Council Rock Sch. Dist., 833 F. Supp. 2d 436, 449 n.9 (E.D. Pa. 2011).

The situation presented here is novel.  Pennsylvania has encouraged the growth of charter schools, which are considered to be public schools and LEAs under the IDEA.  I am faced with a charter school LEA which entered into a binding and enforceable resolution agreement to provide education which a child was entitled to receive but did not.  Plaintiffs aver that they will prove the insolvency of the LEA.  Accordingly, the issue before the Court is where the burden of insolvency falls: should the child be left without recourse to recover the FAPE of which he was deprived, or should the SEA bear the responsibility of ensuring that he receives the education that is his right and that he is now owed?  If discovery confirms that the LEA is, in fact, insolvent, and M.R. would be left without the compensatory education to which he is entitled, I conclude that the proper answer under the statute and case law would be to shift the responsibility for compliance to the SEA.

As discussed above, under the IDEA, both the Supreme Court and the Third Circuit have recognized a FAPE as a right to which children are entitled.  Both tuition reimbursement and compensatory education have been made available specifically to ensure that disabled children are able to receive a FAPE.  Similarly, resolution agreements are specifically authorized by the IDEA, and these agreements are used in the same manner to vindicate the same rights of children under the IDEA.  Congress also expressly included a provision in the IDEA specifying the binding nature and enforceability of these agreements, thus underscoring their importance in the statutory framework.

In Carlisle, the Court of Appeals held that district courts have broad authority pursuant to 20 U.S.C. §1415 to fashion a remedy that will assure a student of an appropriate education.  See 62 F.3d at 536.  There, the court held that such power extends even to an order that compensatory education be provided after a student reaches the age of 21.  Id.  The Third Circuit

14

in <u>Carlisle</u> based its ruling on its earlier conclusion that "Congress intended compensatory education to be available to remedy the deprivation of the right to a free appropriate education." <u>Id.</u>  The principles recognized by the Third Circuit in <u>Kruelle</u>, <u>Gilhool</u>, and <u>Carlisle</u>, and the structure of the IDEA itself, support the conclusion that where a failure to provide appropriate education is acknowledged by a LEA, as reflected by an otherwise binding and enforceable agreement, the obligations of that agreement flow to the SEA where the sole alternative would be to deprive the affected child of a FAPE.

      Such a result is required because, under the Act, the SEA bears ultimate responsibility for ensuring that a child receives the FAPE that he or she is due.  <u>Kruelle</u> concluded that Congress intended the SEA to be a backstop for the LEAs.  Although the SEA is permitted to delegate the actual provision of FAPEs to students, statutorily it remains at the top of the chain.  If this were not the case, then where a LEA could not provide a FAPE to a student, that student would have nowhere to turn to vindicate his or her right.  Like the availability of tuition reimbursement in <u>Burlington</u>, if the resolution agreement is not enforceable against the SEA where the LEA is now insolvent, "the child's right to a free appropriate public education . . . would be less than complete" and "Congress undoubtedly did not intend this result."  471 U.S. at 370.

      It is important to note that charter schools present a unique challenge under the IDEA.  When public school districts encounter financial difficulties, they do not simply cease to exist, but rather merge or consolidate.  Charter schools, in contrast, can simply disappear.  This is a reality that the Court cannot ignore.  The question before me is not whether resolution agreements may be enforced against the SEA in every instance.  Rather, I face the much narrower question as to whether the responsible SEA should be obligated to honor an otherwise valid and enforceable agreement when it is the only avenue to enforce a child's right to a FAPE.

15

In situations such as this, where an LEA in the form of a charter school has effectively ceased to exist, I conclude that the child's right to receive remedial education does not simply disappear because—as this Circuit has made clear—Congress intended the SEA to have ultimate responsibility for assuring that appropriate education is provided.

D. *The Interplay of State Law*

The Commonwealth argues that the IDEA leaves the allocation of financial responsibility for special education costs to each individual State's laws. This leads it to contend that, based on state law governing charter schools, the SEA in Pennsylvania may never be liable for the failings of a charter school in providing a FAPE under the IDEA.

The IDEA sets forth a number of clear requirements that a SEA must implement in accordance with the Act in order to receive federal funding.[3] However, the implementation and structure beyond the specifications of the Act are determined by the SEA. In other words, the SEA is responsible for making sure the substantive portions of the Act are carried out, but may fill in the gaps left by the IDEA with policies and procedures that ensure that the mandates of the statute are met. See Gadsby, 109 F.3d at 943 (the SEA is responsible for "setting up policies and procedures to ensure local compliance with IDEA"). However, this discretion allotted to the SEA cannot rise to the level of permitting a state to disclaim its primary responsibility. Such a result would be in clear contravention of the congressional intent underlying the IDEA.

The Commonwealth proffers Manchester Sch. Dist. v. Crisman, 306 F.3d 1 (1st Cir. 2002), as support for its contention that financial responsibility of a SEA may be disclaimed by state law. However, Manchester dealt with the power of a state to expand the liability of a LEA to provide a FAPE to a student whose parents reside outside of the state. Id. at 10. Manchester

---

[3] At argument, the Commonwealth acknowledged that it receives approximately a half-billion dollars a year in federal funding under the IDEA, the vast majority of which is distributed to the LEAs.

16

does not undermine the proposition that the SEA is the ultimate entity responsible for providing a FAPE.  In light of the structure of the statute, Manchester is read more naturally to mean that the State has broad authority to distribute responsibility amongst the LEAs within the state in discharging its responsibility to assure proper education.  Manchester does not stand for the proposition that a SEA may limit its own liability under the IDEA for the failings of LEAs.

Similarly, Cumberland Reg. H.S. v. Freehold Reg. H.S., 293 Fed. App'x 900 (3d Cir. 2008), involved a dispute between two school districts over which district should be responsible for providing a child of divorced parents residing in different districts with a FAPE under the Act.  The dispute was ultimately resolved according to state law governing the determination of domicile.  Id. at 903-04.  The proposition that a SEA has the power to allocate responsibility among LEAs subject to its supervision is self-evident; it sheds no light on the appropriate response when the responsible LEA ceases to exist, having failed to meet its educational responsibilities and leaving behind an unfulfilled commitment to provide compensatory education.

In asserting that Pennsylvania law should limit SEA liability under the IDEA, the Commonwealth points to a number of state law provisions.  22 Pa. Code § 711.3 provides that "[c]harter schools and cyber charter schools assume the duty to ensure that a FAPE is available to a child with a disability in compliance with IDEA and its implementing regulations . . . ." Additionally, "[w]hen a child with an IEP transfers to a charter school or cyber charter school, the charter school or cyber charter school is responsible upon enrollment for ensuring that the child receives special education and related services in conformity with the IEP, either by adopting the existing IEP or by developing a new IEP for the child in accordance with the requirements of IDEA." Id. at § 711.41(a).  Just as the above cases do nothing to undermine my

17

understanding of the SEA's ultimate responsibility, these provisions only spell out the obligations of a charter school as a LEA rather than limit the obligations of the SEA.  Under 34 C.F.R. § 300.209(c), public charter schools that are LEAs are to be held to the same standards as all other LEAs.

The Commonwealth further points out that under Pennsylvania law "[a]ny indebtedness incurred by a charter school in the exercise of the powers specified in this section shall not impose any liability or legal obligation upon a school entity or upon the Commonwealth."  24 P.S. § 17-1714-A(c).  Where a charter school ceases to function for any reason, "[i]n no event shall such school entities or the Commonwealth be liable for any outstanding liabilities or obligations of the charter school."  Id. at § 17-1729-A(i).

However, these provisions are in clear conflict with the congressional intent behind SEA liability spelled out by the Third Circuit in Kruelle.  The SEA is charged with ultimate responsibility for ensuring that the Act is carried out and qualifying children are provided a FAPE where the LEA cannot or will not perform its obligations.  The IDEA's goal of assuring a FAPE would be frustrated if a State may merely draft a provision that disclaims any liability for its oversight obligations under the Act.

At oral argument, counsel for the Commonwealth handed up Judge Kelly's recent decision in Olivia B. v. Sankofa Academy Charter Sch., No. 14-867, 2014 WL 3797282 (E.D. Pa. Aug. 1, 2014), suggesting that it weighed against Plaintiffs' position here.  In fact, the situation presented by Olivia B. was entirely different.  Plaintiff there had entered into an agreement with a charter school for compensatory education which the charter school failed to honor.  However, plaintiff was, in fact, enrolled in another school, and received the education to which she was entitled.  The court held that "the facts of this case are clearly evident that [the

18

student] was afforded a FAPE." Id. at *6.  The court emphasized that the facts "indisputably indicate there was no harm" to the student, and that, in a striking procedural abnormality, the only harm had been suffered by a successor program which provided the remedial education without compensation, but was not asserting a claim.  Id. at *10.  Here, the exact opposite is true: M.R. is entitled to compensatory education for the FAPE which he did not receive, and will never receive, unless the Commonwealth, as the ultimately responsible SEA, fulfills the terms of the agreement.

**IV.     Conclusion**

For the reasons set forth above, the Commonwealth's Motion to Dismiss is denied.[4]

      /s/ Gerald Austin McHugh
United States District Court Judge

---

[4] Plaintiffs have made out a valid claim under the IDEA, and I reserve the issue of the breach of contract claims until later in the litigation.